Good morning, Your Honors, and may it please the Court. Peter Afrasiabi, Karbono Point of Counsel, on behalf of Petitioner. Your Honors, I think the central threshold question in light of the Court's order to us is to address the jurisdiction question, and that is whether this Court has jurisdiction in light of 1252 and Ramadan to consider the terrorism questions for purposes of asylum and withholding of removal. We submit, Your Honors, that the shadow cast by Ramadan includes this case, and this case does not fall outside the heartland of Ramadan, like some other cases. One of the cases you've previously mentioned, Judge Fletcher does, involving exceptional extreme unusual hardship. There's two main points for why this Court has jurisdiction when you look at this narrow question. Number one, there's nothing subjective. There's nothing that's value-laden. There's nothing discretionary for an immigration judge to analyze a set of facts, not even disputed facts, credibility has been found, but a set of facts and analyze whether that constitutes terrorist activity. That is really a quintessential mixed question of fact and law, just like the Ramadan question, and unlike the subsequent cases that have held, you know, I guess it's not a Ramadan mixed question of fact and law, even if it would otherwise be a mixed question when the underlying question is subjective. The second point really devolves from there, and it's an important point, and that is that here there was no adverse credibility finding. Notwithstanding the fact that the government argued extensively in closing that major argument, the immigration judge rejected it, and on page 80 of the administrative record, as I'm sure you know, the judge actually found her to have credibility insofar as her prosecution concerns exist. So for those reasons, we submit, Your Honors, there is jurisdiction for this Court to then analyze the question of whether those facts that are in the record, A, B, C, D, and E, right? It sounds as though the government in the last case might have agreed with you on that point, but we'll see what happens when the government stands up. I think so. You know, I think that then brings us to that next question, which is the terrorism question, and it's the question of whether here, if you take these facts that are undisputed, the facts are in the record, she was found to have credibility. It's not a situation of, you know, she said the light was red and the government brought another witness who said the light was green. It's her testimony, and the question is, what do those facts mean? Well, her testimony wasn't so much the light was red, it was kind of yellow. I mean, she did acknowledge, although she denied extensive knowledge, she did acknowledge, I believe, that she knew of the organization's intent to overthrow the government by force. Well, Your Honor, I think we have to look very, very carefully at the facts in the record. She did use the word force, and I know that's been batted around a lot between the briefs. On cross-examination in response to a very open-ended question by the government, and that's page 149 of the record, the government asked her to stand and deliver, really, and what do you mean by force? And the question was, you said your husband was organizing a force. What kind of force? And the answer was, it just organized the people, recruited the people, organized their names on the list, and sent it to the hierarchy. I think that description of force really casts, you know, a pretty long shadow over all her testimony. So when she's using the word force or to fight, that is her understanding of the word on this record. But much like, you know, Howard Dean, when he was running for president, you know, he lost in Iowa, said, we will fight on. You don't necessarily, in view of the word, fight with violent motives. And, you know, presidential candidates organize forces all the time. He also said, arrr. Eddie did, and I won't try to do that. But that really is the question here, I think. You know, you look on the record, and she said she, you know, she helped prepare names, it appears, for this force, which was later really narrowly defined to not be anything she understood to involve, you know, weapons and violence. That's her understanding of what it meant to fight for the freedom of the people of Cambodia through, you know, what she thought was a democratic movement. And the critical fact that also isn't controverted is that her husband didn't show her all the documents about the impending coup attempt and what may come from that. Yeah, at what point, as we discussed what she knew, didn't know, the degree to which her husband might have protected her from some information and so on, at what point do we move beyond undisputed facts in the Ramadan universe and into disputed facts where we may or may not have jurisdiction? I don't think you move past that line in this case at all. The facts are what they are in the record. You know, you can read the record, and it's not my spin on the facts. The record says what it says. It says, this is my understanding of the word force, and it says, I recruited names. Those are pretty static facts. By your reckoning, counsel, wouldn't we have jurisdiction in every case? Well, you would not have jurisdiction if there were genuinely disputed issues of fact that the immigration judge said, you know, But it sounds like the way you're applying it, if the alien and the government answer questions differently or pose a question and it's answered slightly differently, then you've got a mixed law and fact situation, don't you? You've got disputed facts or maybe not so disputed facts. Doesn't that really get us into the jurisdiction of all of these cases? Well, no, I don't think it does, because if you have a situation where you have conflicting witness testimony and the immigration judge has to call it, he's just got to call it, right? And he calls it, yay, okay, that disputed fact has now been determined conclusively one way, and that fact is the set building block, just like the building blocks we're dealing with here. It is what it is. You can't come up here to the Ninth Circuit and say, geez, the immigration judge got it wrong. He should have gone the other way. Now, the question of whether even as called, what is the legal significance of that fact and does it get you in combination with the other facts over the relevant litmus test is the mixed question of fact and law. So you have jurisdiction then. You just don't have jurisdiction to undo the fact as found by the immigration judge when he had to make the call. I thought you were arguing that the construction of what she understood about force was in fact what we're able to do, and yet that is a factual question. Well, she was found to be credible, so we simply look at the record and take her testimony as true, and that is her definition and description of force. So it is what it is. That fact exists in the record that she understood a force to be afoot, which was going to recruit names and organize people, not a force of violence. So that is the fact in the record, and that doesn't, we submit, coupled with the fact that she was shielded from knowledge. There's nothing in the record that would raise a question about her understanding of that term. I don't think there is. I think the record is pretty clear that when asked on cross-examination, it was an open-ended question. I know what you said about that, but elsewhere in the record, is there anything? Well, elsewhere in the record, she does use the word force, but it's in this context where you could, if you want, imbue it with sinister territory. Talk about the coup, if she was aware of the coup or what happened ultimately. This is another important point. There is reference in her, in Exhibit 2, the application. There's some handwritten notes in there. This, too, is a very, very critical evidentiary point, really. That document was never placed before her, before the immigration judge. At a hearing several months before, it was simply admitted into evidence. That doesn't really answer the question, though. Who said what and when in that document is really important. And that document is typewritten. She's Cambodian and doesn't speak English or write English. It's got her signature in her native language in the record box, and there's a bunch of handwriting on it. Some of the handwriting is clearly not written by her. It's facially written by the asylum officer. Some of the other handwriting doesn't actually note, you know, this is the asylum officer. Candidly, if you just look at the handwriting, it all looks really, really similar. We don't know if any of those handwritten notes are actually statements she made, ascribed, and adopted. The government never put Exhibit 2 before her and said, are these your statements, do you agree with them? So we can't really go to some of those statements that are in handwritten notes and say that is a fact in the record that she adopted, agreed to, and stated. It doesn't exist. You just have a document that's been admitted for what it's worth, and it doesn't really get you anywhere. It's more like we have evidence that conflicts, doesn't all point in the same direction, not a universe of undisputed facts. I'd be hard-pressed to say that when you have testimony or statements attributed to a person that don't all speak with one voice or do not all point to the same conclusion, there are things in her testimony and in particular in the application that would otherwise, in other circumstances, permit a finding based on those statements of support for an organization that she knew participated in violence or intended by force of arms to overthrow the government. And to say that there are other statements that permit the first set of statements to be viewed through a lens that recasts a different meaning, that strikes me as very much like the kind of thing an adjudicator of fact does, not a set of undisputed facts that we can view as a question of law. I'm not saying that it recasts the statement. What I'm saying is the initial assumption that one may take to the word force is because we're dealing with Cambodia, the assumption is, oh, it must be violent because it was a coup attempt. And so we imbue that word with a certain meaning. And then when you get later on in the record and she defines what force means, you undo it. That's not what we're saying. What I'm saying is we shouldn't be imbuing that word as originally used with anything other than it's a word in the English languages translated that means force. Whether it means violent force is a question that one would need to follow up on and get the answer to, that she never gave testimony that it was to be violent. What we then have is a very clear statement by her of what she understood force to mean, which would eliminate the legitimacy of a contrary interpretation. So, I mean, this isn't, it's not that she said, yeah, I believed in violent force and then later said, well, this is what I mean by force. It's not violent. And you're now dealing with incredibly conflicting facts. What you're dealing with is a statement that may have been imbued with some meaning that's not really there that then is clarified. I think your argument's easier if you're dealing with the prong what she knew. Your argument's harder, and I'm having trouble. Frank, I mean, I don't have, from my own mind, a very clean answer. What do you do with reviewability on the question of should have known? What implications can the fact finder draw from the entire circumstances as to, well, maybe she didn't know it, but she should have known it. How much of that is reviewable by us? What she should have known has to be something that exists in the record. Well, what exists in the record is, for example, there's a 2002 coup. Should she have known that? Well, no, that's the point. There's no evidence in the record that she should have known. The evidence actually is contrary. The evidence that's undisputed, that she's found credible, is that her husband didn't show her the documents about the coup. Yeah, but as I read that evidence, she says he wanted to protect her from the details of the fighting. Now, that doesn't mean necessarily that she didn't know that there was going to be a coup attempt. Well, but to conclude otherwise is now to create a fact here in the record, and you're now implying a fact into the record that isn't there. I thought Exhibit 2, she's quoted as saying, I supported taking up arms against the Hun Sen military. That's in the record. Why doesn't that support the concept that Judge Fletcher just mentioned? Because we don't know if my client ever made that statement in Exhibit 2. That's a handwritten statement in Exhibit 2. That's the one you referred to earlier? Yeah, exactly, Your Honor. It's on page 295 of the administrative record in handwriting, which if you just complete, there's some unique passages. Was it contested at the time of the hearing? Did she say, I didn't write that, I didn't say that? No, she never, she never. She didn't even know it was in the record? Say it again. She did not know it was in the record? I don't know if she knew Exhibit 2 was in the record. Did counsel comment on the letter? No. No one placed Exhibit 2 before her on direct or cross and asked her about it. Was there any discussion in the record where counsel for your client made reference to the letter? I don't believe so, Your Honor, but I can't give you a definitive answer on that. I'd have to look at that. But I don't believe in the closing argument that the trial lawyer for my client before the immigration courts sort of as her agent adopted that statement as a statement she made. I don't believe that exists in the record. Okay. Why don't we hear from the government and then we'll have a chance to respond. Thank you, Your Honor. May it please the Court. Ada Vosk on behalf of the Attorney General. The problem here with knowledge is that this was never presented before the immigration judge and it was never presented before the board. It is first in the first point brought up in Petitioner's supplemental brief, not even in the initial brief. And what the Petitioner is asking the Court, although he says not, but he's not, is for you to make findings a fact, that there are competing facts. We can sit here and he can throw quotes from the transcript and I can do the same, but in the end that's what should have happened before the immigration judge. If she were really disputing her knowledge, that would have been an issue before the immigration judge that the board would have reviewed and then this Court would be able to properly consider it. But because it has never been exhausted, the Court lacks jurisdiction to consider it now. I would add that in their response to that argument initially they said, well, we concede that we didn't exhaust this, but it would be, I can't remember what the exact word was, but it was something like it would be expedient for the Court to consider it now. Well, it's seven years into the proceeding, so it's certainly not, it would have been more expedient if she had made this argument before the immigration judge. And she did not. Likewise, the question of her asylum application, her asylum application, for the first time in oral argument they're contesting whether she understood what was in there. That, again, is an issue that should have been raised before the immigration judge or at a minimum before the board, but it was not. So, again, the issues that Petitioner raises before this Court at argument are simply issues that they have not exhausted. I would go on to the question of the asylum and the withholding of removal as well as the CAT, which are the substantive issues that the Court has before it. I think we don't dispute, I think it's undisputed that the CFF is a terrorist organization, that what they did in the attempt to coup amounts to terrorist activity, and this Court has found that, at least in an unpublished decision in Chaube. And then there's... Judge Clifton and I remember perfectly. And then there's what she did, and what she did was she solicited funds, and here she said she went village by village to collect funds for the CFF. She assisted in recruitment, and she participated in the administrative structure of the organization. Those things, again, either are individually specified in the statute as engaging in terrorist activities or material support. So then there's what she knew and what should she have known, a question that has not been disputed before, because what she argued before the Board, at least, was that it didn't matter that she knew because it was an expression of her political opinion, and her argument was a legal one that her conduct, therefore, should have been accepted from the terrorism bar because it reflected her political offense. That's an argument she's not making anymore. As to what evidence would support a finding that she knew, I'll just read you from the transcript. And this is what I mean by we can go back and forth as to what her statements meant, but it's something that should have been argued before the immigration judgment was not. She was asked, and this is, I'm sorry, at Administrative Record, page 143. So when you joined the CFF, you knew this was an illegal organization. Is that correct? Yes. And at the time of its inception, the CFF wanted to overthrow the government by force. Yes. Okay. And knowing this, you went to people's homes soliciting money for the CFF. Is that correct? Yes. And on that record, I would say, I would hope the Court would find that the immigration judge certainly had substantial evidence to find that she knew or should have known that the CFF was a terrorist organization and thus was subject to the terrorism bar for asylum and withholding of removal and withholding under cap. So the only thing that was left to her was deferral of removal under cap. And although it wasn't discussed in the opening argument, I'll simply add, her brother was a provincial leader in the CFF organization. He was arrested. He was prosecuted and is currently incarcerated. At least he was at the time of the hearing. I don't know if he currently is. She never alleged that he, who is in some ways very similarly situated to her, although granted he had a greater role, that he was ever subject to torture. So she pointed simply to no evidence that would compel this Court to find that it is more likely than not that she, a relatively minor player compared to her brother, would be subject to torture. So for those reasons and the reasons set forth in our brief, we'll ask that the Court dismiss and deny the petition for review. Thank you. Roberts. Thank you. Response. Thank you. With respect to the exhaustion issue, that's not correct. If you look at page 3 of the record, it's about line 20 or 21 in the BIA's opinion, they address the issue of knowing or should have knowing. So what we're really talking about here is the argument that through the rubric of exhaustion, this Court should apply some sort of administrative waiver doctrine. She didn't raise it properly before the BIA, and therefore she's precluded here, even though the BIA addressed the issue. So exhaustion is not an issue. With respect to, and we didn't address the knowledge issue and the other issues, obviously, given the time constraints, but, you know, in answer, I think, to your question, Judge Smith, either of me or the prior case, and I apologize, with respect to torturing in Cambodia of CFF members, the tube case on which you, Judge Fletcher, and Judge Clifton were members, found credible by the immigration court testimony that CFF members have been tortured in Cambodia by the Cambodian government. That is a relevant fact that we can't ignore. So we do have evidence of torture there, including the other arguments we've made in our brief about what would likely happen to our client if she's not just returned to Cambodia, but she's returned with a badge from the U.S. government stamped on her as a quote-unquote terrorist. That is a very, very significant issue, which is why I've, you know, we have focused and pressed so hard on let's be very clear about what the facts are before you label someone a terrorist and ship them back to a country where just reading the country report, notwithstanding, you know, some of the stuff in there, what may have been said by the Chief Justice of their Supreme Court, that report is really clear that they abuse people. People are tortured, even though there's apparently legal process. The legal process is cast aside on occasion, and it takes no great leap to read that country report and recognize that someone who shows up on the shores who the government believes was a member of the CFF in an illegal coup attempt within the country, right, and has been branded by the U.S. government as a terrorist, that begins and ends any inquiry in all likelihood, and that's no great leap to make looking at the country report. I see I'm out of time, so unless the Court has any further questions, we would submit. I think not. Thank you very much. Nice arguments in this case on both sides. Hing Chun versus Holder submitted for decision. We've got one last case on the argument calendar. We thank you for your patience. United States versus Haines.
judges: Kozinski, Pregerson, Mills